Filed 12/8/21  Terri R. v. Superior Court CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| TERRI R. et al., <br>     Petitioners, <br> v. <br> THE SUPERIOR COURT OF CONTRA COSTA COUNTY, <br>     Respondent, <br> CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU, <br>     Real Party in Interest. | A163402 <br><br> (Contra Costa County <br> Super. Ct. No. J2000449) |

On August 27, 2021, the juvenile court set a hearing to consider termination of parental rights and select a permanent plan for two-year-old T.R.  (Welf. & Inst. Code, § 366.26; subsequent undesignated statutory references are to this code.)  T.R.'s mother, Terri R. (mother), and presumed father, D.H., seek review by extraordinary writ, contending they were denied reasonable family reunification services.  T.R.'s alleged father, T.J., has also filed a petition seeking extraordinary review.  T.J. contends the court erred by setting a section 366.26 hearing without ordering a DNA test to determine if he is T.R.'s biological parent.  We deny all three petitions on the merits.

## FACTUAL AND PROCEDURAL HISTORY

## I. Dependency Proceedings in San Francisco

In December 2019, the San Francisco Human Services Agency filed a juvenile dependency petition on behalf of nine-month-old T.R. under section 300, subdivision (b)(1), (g) and (j). The Agency alleged that T.R. was at substantial risk of serious harm because of mother's substance abuse, her untreated mental health issues, and the unsafe condition of her home (§ 300, subd (b)(1)); T.R. was left without provision for support because the whereabouts of his alleged fathers, D.H. and T.J., were unknown (subd (g)); and T.R. was at substantial risk of abuse or neglect because mother failed to reunify with four of T.R.'s half-siblings (subd. (j)).

When this dependency case was filed, mother appeared to have support people and had stated that she was open to addressing her substance abuse issues. The Agency did not request that T.R. be removed from mother's home, but sought court intervention due to safety concerns and the need for further assessment of mother, who has struggled with substance abuse and mental health issues for 15 years.

On December 13, 2019, the juvenile court appointed counsel for mother and T.R. and provisionally appointed counsel for T.J. and D.H. The court found that notice of the proceeding had been given as required by law and continued the matter for a jurisdiction hearing. At the December 16 hearing, jurisdictional allegations were denied, and the matter was continued for a contest.

In a January 2020 disposition report, the Agency recommended that the court declare T.R. a dependent child and order that he reside in the home of mother with family maintenance services. The Agency was already concerned by mother's lack of commitment to engaging in services that had

2

been offered to her, which included drug testing, parenting education, and mental health counseling.  Mother had identified T.J. as T.R's biological father, but she also requested a DNA test.  The Agency reported that T.J. had been incarcerated at the San Bruno County Jail since December 2018, and the whereabouts of D.H. were still unknown.

On March 11, 2020, the court held a contested jurisdiction and disposition hearing.  Mother was present, D.H. was present on the phone, and all three parents were represented by counsel.  D.H., whose name appears on T.R.'s birth certificate, was elevated to presumed father status.  Counsel for T.J. requested that T.J.'s status as an alleged father be "stricken from [the] court record."  The court granted the request and permitted T.J.'s counsel to withdraw his representation.  Mother and D.H. stipulated to jurisdiction under section 300, subdivisions (b)(1) and (j), pursuant to amended petition allegations, and the matter was continued for disposition.  Notice of these rulings and the right to seek rehearing and/or appeal was sent to T.J. and his counsel.

On April 21, 2020, the Agency was contacted by a non-relative family member of mother, D.D., who reported that T.R. had been staying in her home in Antioch since March 3, and she was providing full-time care for him.  By that time, mother had moved to Antioch, and when she had a video visit with the social worker, she arranged for D.D. to bring T.R. to her home so the Agency would not suspect that T.R. was living elsewhere.  According to D.D.'s referral, mother "was stressed out" by having T.R. in her home and had relapsed.  D.D. also reported that she had not been willing to leave T.R. with mother because mother's home was filthy and unsafe.

When the social worker went to mother's home to follow-up on D.D.'s report, mother took a long time to answer the door and then refused to admit

3

the social worker, coming out onto her porch. The social worker advised mother that the Agency had received a referral that mother had relapsed. Mother became defensive, denied relapsing, and volunteered that T.R. was staying with D.D. so that he would not have to travel with mother to San Francisco on BART during the COVID-19 pandemic. When the social worker continued to express concern that mother had relapsed, mother was adamant that she would not go into residential treatment. However, she agreed to voluntarily relinquish custody and to work with the Agency to create a safety plan. Mother stated that she wanted D.H. to take T.R. The social worker attempted to contact D.H. and his mother, K.P., but they did not respond to messages.

On April 24, 2020, the Agency filed a second amended petition seeking to detain T.R. from mother and D.H. The Agency sought a more restrictive placement for T.R. pursuant to allegations that mother had relapsed, her home was unsafe, she failed to participate in services, and D.H. failed to respond to Agency calls to assess him for his ability and willingness to care for T.R. A contested detention hearing was held on April 30. T.R. was detained and placed with D.D. Due to the COVID-19 pandemic, the court ordered virtual visits for both parents. Once mother was medically cleared for in-person visits, she was to have supervised visits at D.D.'s home for a minimum of six hours per week. Once D.H. presented himself to the Agency and was medically cleared, the Agency had discretion to arrange supervised visits. The matter was continued for a settlement conference and a contested jurisdiction/disposition hearing.

According to a June 2020 interim report, D.H. was living with mother, and the social worker finally met him there, making contact for the first time on May 19. The social worker reviewed the case plan with D.H. and mother

4

and they both signed it. The social worker suspected that D.H. was using illegal substances. She discussed services with him, and advised him to begin drug testing immediately, but he did not. The Agency reported that D.H. lost custody of an older child in Sacramento but had few details about the "sensitive" matter.

The Agency reported that mother had not actively participated in services since T.R. was detained. She failed to appear for scheduled drug tests, and her participation in outpatient treatment at the African American Healing Center was sporadic. There was a long waiting list for therapy at the Healing Center, so the Agency referred mother to another provider for mental health services, but mother insisted on waiting for a Healing Center therapist even after she was reminded that participating in therapy was a case plan requirement. Mother failed to appear for a parenting class, agreed to reschedule, but failed to follow up. She told the social worker that she dropped her phone in the toilet, so the Agency gave her an iPad, but mother still failed to access services. After mother was medically cleared to visit, D.D. offered her "liberal face-to-face visits," but mother did not visit consistently and did not actively engage with her son. D.D. complained that mother came for visits late at night, arrived without a mask, and did not take the COVID-19 pandemic seriously.

The Agency reported that it had worked diligently with mother, taking the approach that "people can grow and change," but it was concerned by mother's lack of effort, failure to participate in needed services, and apparent failure to comprehend the gravity of her situation. The Agency recommended transferring T.R.'s case to Contra Costa because mother had moved to that county and had people there who supported her. Although the Agency provided a travel stipend, mother had complained that transportation issues

impeded her ability to engage in services, and the Agency hoped that transferring the case to Contra Costa would "make things easier for [mother] as she work[ed] towards reunification with her son."

In August 2020, the Agency filed a third amended petition on behalf of T.R., who was then 14 months old. This petition supplemented the basis for jurisdiction under section 300, subdivision (b)(1) with allegations that mother's long history of substance abuse required treatment in order for her to be a safe and adequate parent; mother had been inconsistent in her participation in services; and mother allowed T.R. to stay with a non-relative family member for an extended period during the COVID-19 pandemic without Agency permission.

An addendum report was filed in anticipation of the contested jurisdiction and disposition hearing. D.H. had not participated in any services and the social worker surmised that D.H. was not interested in reunification but had been pressured by mother to become involved in T.R.'s case. D.H. was unemployed and lived with mother, who paid his rent and household expenses. D.H. appeared to be "active in his addiction," but the Agency could not be sure because he did not drug test. Nor had he taken a COVID test, so he could not visit T.R. D.D. reported that D.H. attended visits with mother but waited outside on the porch and told her when it was time to leave.

Mother continued to fail to drug test, aside from one negative test on June 5. The director of mother's out-patient program at the African American Healing Center was concerned that mother was not being honest with herself regarding her sobriety, was not using the support provided to her, and was not serious about reunification, but was just "playing a game." The Healing Center took mother off its waiting list for therapy because she

6

had an alternative referral from the Agency, but mother had not utilized that referral.

The Agency was concerned that mother was refusing support for her mental health and only minimally complying with outpatient treatment, as reunification would not be possible if mother did not engage in these services. The Agency was also concerned about mother's lack of engagement with T.R. She had four visits between June 2 and June 16, although half of them were part of her parenting class. D.D. reported that mother was angry at her for reporting mother's sporadic visits and had threatened to have the Agency move T.R. to the home of T.J.'s mother. D.D. also reported that mother asked her to lie about the amount of time that mother visited T.R.; if she stayed for an hour, she wanted D.D. to report that she visited for three hours.

On August 7, 2020, the court held a contested jurisdiction and disposition hearing in the absence of D.H., although his counsel appeared. The court found the amended jurisdictional allegations had been established, declared T.R. a dependent, and continued his placement with D.D. The court found that mother made minimal progress toward alleviating the problems that led to the dependency while D.H. made no progress. It ordered reunification services for both parents as recommended by the Agency. Mother's services were individual therapy, outpatient substance abuse treatment, a parenting class, and weekly random drug testing. D.H.'s services were individual therapy, weekly random drug testing, a parenting class and a substance abuse assessment followed by treatment if referred. Supervised visits for mother were to continue, with in-person visits in the caregiver's home three days a week. The court ordered no visits for D.H. The motion to transfer T.R.'s case to Contra Costa was granted.

## II. Dependency Proceedings in Contra Costa

T.R.'s case was transferred to Contra Costa County on August 27, 2020. In September, the court appointed new counsel for D.H. and ordered that he be afforded supervised visits with T.R. for a minimum of one hour once a week. A six-month review hearing was set for late January 2021, but it was continued several times and ultimately became a contested twelve-month review hearing.

### A. The Six-Month Report and Recommendations

In a January 28, 2021 six-month status review report, the Contra Costa Child and Family Services Bureau recommended terminating reunification services and scheduling a section 366.26 hearing. According to the report, mother and D.H. "consistently avoided contact" with the Bureau, and demonstrated "little to no interest" in following through with their case plan. Meanwhile, T.R. was on target developmentally, safe, and comfortable in D.D.'s home, and D.D. wanted to adopt him.

The Bureau reported that making initial contact with these parents was difficult because mother did not have a working phone number and there was concern that D.H. had been exposed to COVID. In October 2020, the social worker met with parents over "FaceTime" and reviewed their case plan, which required weekly drug testing, domestic violence prevention training, and psychological treatment. Mother denied needing a domestic violence course and reported she would resume parenting classes at the program she had used before T.R.'s case was transferred. The social worker gave mother a number for the "access line" where she could schedule therapy and explained how parents could obtain bus passes.

In November 2020, mother's counsel asked the Bureau for a letter stating that T.R. was going to be returned home because mother was

8

concerned that she would lose her housing voucher if T.R. was not living with her. Counsel assured the social worker that mother was " 'fully participating' " in treatment at the African American Healing Center and that she would begin drug testing as soon as she was provided with a referral. The social worker responded that the Bureau could not assure that T.R. would be returned to mother and advised mother's counsel that both parents had already been provided with information about how and where to drug test. The Bureau also contacted mother directly and informed her again about how to drug test and provided the number for that service.

In December 2020, the social worker had an in-person meeting with mother, gave her bus tickets, and provided another copy of her case plan. Mother was disheveled and appeared to be abusing substances. She acknowledged that she had not begun drug testing or scheduled therapeutic services and stated that she did not have any questions about her case plan. After the meeting, the social worker visited T.R. D.D. reported that it had been at least a month since mother's last visit and expressed concern that mother was regularly using drugs.

On January 22, 2021, the social worker had a telephone call with mother and D.H. Mother reported that she had not begun drug testing because she was afraid to leave her home due to a recent break-in. D.H. admitted that he had not participated in drug testing and that he smoked "weed" on a regular basis. Mother had not begun therapy and reiterated that she did not need domestic violence counseling. She gave the social worker a phone number for her parenting course, which connected to a voicemail that did not identify any agency.

In recommending termination of family reunification services, the Bureau reported that "the situation is entirely unaltered from six months

ago; the pattern of avoidance, excuse making and failure to engage in even the most basic services continues as do[] the missed visits, bizarre behavior and lack of engagement." During the entire reporting period, parents failed to submit any drug testing results, nor were they participating in therapeutic or parenting services. Mother visited T.R. approximately once a month, missing most visit opportunities available to her. Visits that did occur went well, with no reported issues.

Parents objected to the Bureau recommendations, and the status review was continued for a contested hearing on April 8, 2021.

## B. The April 2021 Memorandum and Continued Hearing

Prior to the first session of the contested hearing, the Bureau filed a memorandum outlining additional services that had been provided to the family.

In February 2021, the social worker delivered bus tickets to the parents and provided D.H. with an identification card. At that time, D.H. reported that he had started therapy. On March 25, the social worker had a telephone meeting with mother, who had not appeared for a drug test since January 28. Mother confirmed that she and D.H. had bus tickets to get to testing but complained that the center was far away. Mother also said she was overwhelmed because she had received a 15-day notice about her housing. On March 29, the case worker met with parents and reviewed their case plan. Mother reported that she had been unable to drug test because she was stressed about losing her apartment voucher. Mother admitted that she had a recent substance abuse relapse but would not disclose what she took. D.H. was participating in weekly therapy with Dr. Destefano through the county health services. Mother was not in therapy but stated that she was on a waiting list. On April 5, the social worker spoke to mother, who reported that

10

she and D.H. had scheduled intake assessments with the "REACH program." The social worker provided mother with a referral to the county's addiction specialist. As of that time, D.H. had not had a single drug test, even though he had been given testing information and bus tickets for transportation to the center in January, February and March.

The Bureau renewed its recommendation to terminate reunification services. It also expressed the belief that returning T.R. home would be detrimental to his safety and emotional well-being. Parents had never actively engaged in their case plan, failing to drug test and failing to commit to regular visitation with T.R. The Bureau also suspected that mother was actively abusing substances.

On April 8, 2021, the court held the first hearing for the contested review. Mother, D.H. and T.J. appeared by telephone, all sharing the same phone line. T.J. sought to participate as T.R's biological father. The Bureau objected that the San Francisco court had excluded T.J. as T.R.'s father pursuant to a request from T.J. himself. T.R.'s counsel concurred and argued that a section 388 motion would be required for T.J. to intervene as an alleged father. Mother and D.H. argued that T.J. was entitled to counsel and an opportunity to participate. The hearing was continued so counsel could be appointed for T.J.

### C. The June 2021 Status Review Report

The Bureau filed an updated status review report in June 2021. According to the Bureau, "[t]he most glaring aspect of this case over the review period has been the unchanging quality of the situation." Mother and D.H. were "distant, uninvolved, often seeming intoxicated and unable to converse in a meaningful manner." They expressed an interest in reunification but missed visits, failed to engage in services, and did not drug

11

test or perform "the most basic parts" of their case plan. The social worker reported observing behavior by both parents on "several occasions" that was indicative of being under the influence.

The Bureau reported that the parents visited T.R. at D.D.'s home but were not committed to regular visitation. As a member of the "extended legal family," D.D. was comfortable supervising visits in her home. She reported that mother visited once a month between February and April and three times in May. During one visit, mother acted paranoid and expressed concern that the government was spying on her. For this reporting period, the Bureau documented six out of 24 possible visits.

The social worker reported troubling behavior by both parents during an April 2021 visit at their home. D.H. had blood shot eyes and other physical symptoms indicating he was under the influence, while mother was incoherent and could not be engaged in conversation. The social worker went to his car to get drug testing information, and when he returned D.H. quickly removed a marijuana cigarette from his mouth. Then mother began shaking and was non-responsive for several minutes, causing D.H. to call an ambulance. The paramedics who treated mother did not disclose what caused her emergency. Mother later reported that she had a bad reaction to medication.

The Bureau reported that, throughout the dependency, mother told conflicting stories about the status of her housing. For example, during a home visit in May 2021, mother claimed that she was in danger of losing her apartment because of noise complaints from the neighbors. Later though mother reported that she could remain in her apartment as long as she paid her rent. In June, the social worker confronted parents about their case plan obligations and lack of responsiveness to case plan activities, focusing

particularly on the failure to drug test, and he warned them about the consequences of failing to demonstrate a commitment to reunification. The next day, mother "confided" that she had not drug tested because of her stress and anxiety. She said that she had scheduled a therapy appointment for the following week but could not provide the name of her therapist or program provider.

An updated case plan was attached to the June 2021 report. The update reflects that mother completed a home safety program but she had not drug tested since January, did not participate in any mental health counseling, was non-compliant with court orders, and was residing with a possible drug user. Meanwhile, D.H. had made progress toward the case plan objective of maintaining a relationship with T.R. by participating in six visits between February and June 2021. However, D.H. failed to drug test and was seen online on "fb live" smoking a substance from a glass pipe.

### D. T.J.'s Requests for DNA Testing

On July 22, 2021, T.J made an oral motion for the court to order DNA testing. A minute order from the hearing reflects that the court denied T.J.'s motion, which was made pursuant to section 388, on the ground that changed circumstances had not been established. On August 2, T.J. made a second motion under section 388, by filing a request to change court order (JV-180). T.J. requested that the court change its July 22 order denying DNA testing because mother had identified T.J. as the biological father of T.R., and if T.J.'s paternity was established then T.R. could potentially have a placement with T.J. and a relationship with T.J.'s family. On August 23, the court denied T.J.'s motion because (1) he did not state new evidence or a changed circumstance, and (2) his request "was fully litigated and denied based on an oral motion pursuant to [section] 388 on July 22, 2021."

13

### E.  The August 2021 Memorandum Report

The Bureau submitted a memorandum in advance of the contested review hearing, which had been re-set for August 27, 2021.  This update was prepared by social work supervisor, Renee Resendez.  The Bureau had continued to engage with the parents but there was little substantive progress toward case plan objectives.

Since the Bureau filed its June 2021 report, neither parent had drug tested; mother attributed her lack of testing to " 'recent stress and anxiety,' " and D.H. had also failed to test despite being provided bus tickets.  The Bureau had followed up on parents' report that they were going to start the "REACH program" in April 2021.  D.H. had reported that his therapist referred him for REACH services, and mother reported that she had also made an appointment.  On August 3, the Bureau was notified that mother and D.H. participated in an "intake" but never attended the program and "were discharged."  That day, the Bureau sent parents a letter with drug testing information, another copy of their case plan and additional referrals for services.  A social worker also attempted to make telephone contact with parents to discuss their case plan.

On August 5, 2021, a Bureau social worker, Mr. Luzuriaga, conducted a home visit with T.R.  D.D. reported that T.R. was healthy and thriving.  Luzuriaga inquired whether D.D. needed additional assistance or had any concerns about T.R.  D.D. reported that another social worker, Mr. Fairweather, had made monthly visits and she currently had no needs or concerns.  When Luzuriaga asked about visitation, D.D. reported that there was no strict visitation schedule; mother would call, and they would agree on a time.  Mother visited once a month for about thirty minutes.  D.D. reported

14

that mother was " 'high' " during a July 16 visit and expressed frustration about the incident and mother's behavior generally. (Italics omitted.)

On the afternoon of August 5, 2021, Luzuriaga made telephone contact with mother after numerous attempts to reach her earlier that week. Mother reported that she was about to start in-patient drug treatment but could not provide the name of the program. Mother admitted drinking alcohol and smoking marijuana, but she denied using methamphetamine. She also acknowledged that she was not in therapy. The case worker offered referrals, but mother rejected them, stating that she would get the services she needed when she began her in-patient program. Mother said that she visited T.R. every other week and expressed frustration at being supervised.

After Luzuriaga finished talking with mother, he talked to D.H. about the case plan and D.H.'s responsibilities. D.H. was not drug testing and acknowledged ongoing use of marijuana. He was not in a substance abuse program or parenting class. He reported that for the past two or three months, he had participated in weekly counseling sessions that were conducted on-line. When asked what he had gained from therapy, D.H. "stated simply, 'It gets the job done.' " (Italics omitted.) After his phone conversation with the parents, Luzuriaga sent a resource letter to D.H. setting forth services available to both D.H. and mother.

In early August 2021, Luzuriaga made several attempts to contact T.J. to no avail. He left messages asking T.J. to contact the Bureau and providing information about the upcoming hearing.

**F. The Contested Review Hearing and Court Findings**

At the August 27 contested review hearing, mother appeared with counsel, via "Zoom." D.H. was represented by counsel but did not attend the hearing. T.J.'s counsel appeared but acknowledged her client likely did not

have standing to participate in the proceeding. T.J. was on the telephone with his counsel for part of the hearing.

County counsel urged the court to follow the Bureau recommendations to terminate reunification services and set a section 366.26 hearing, submitting the matters based on its reports. T.R.'s counsel concurred, also submitting on the reports. Mother and D.H. objected to the termination of family reunification services, calling Renee Resendez from the Bureau as their only witness.

### 1. Resendez's Testimony

Ms. Resendez is a social work supervisor who became involved with T.R.'s case on August 1, 2021. Resendez testified that two social workers had been assigned to the case since it was transferred to Contra Costa. Mr. Fairweather was assigned the matter in August 2020, went on medical leave at the end of July 2021, and was replaced by Mr. Luzuriaga. As Luzuriaga's supervisor, Resendez assisted him in managing this case while Fairweather was on leave. Resendez did not supervise Fairweather. However, she reviewed the case file, which showed that Fairweather had contact with the family "on a consistent basis." Resendez did not notice any missing case notes or other missing information.

Mother's counsel asked Resendez about events that were documented in the case file. For example, when Fairweather met with mother in June 2021, mother complained about experiencing stress. In response, Fairweather provided her with the access line phone number for mental health counseling. Resendez also confirmed that mother completed a parenting program in San Francisco. She testified that she followed up on mother's report that she was going to be assessed for services at the REACH

16

program in April. The Bureau had referred mother to that provider, but when Resendez called, she was told that mother did not enroll.

Resendez testified that the Bureau obtained reports about visits from T.R.'s caregiver, D.D., who was responsible for supervising parents' visits. In addition, Fairweather had observed one visit in May 2021. In August 2021, the caregiver reported that mother appeared to be high on drugs when she came to visit T.R. Resendez did not know whether mother had formed a bond with T.R.

Father's counsel asked Resendez only a handful of questions, all pertaining to whether the social workers had spoken with D.H.'s therapist. Resendez testified that she did not see anything in the file to indicate the Bureau made direct contact with D.H.'s therapist.

### 2. Arguments By Counsel

Mother requested that the court order an additional period of family reunification services on the ground that she was hampered by the lack of continuity attributable to the case workers' medical absences. Her counsel argued that mother had demonstrated that she could succeed in services because she successfully engaged in services in San Francisco and had wanted to be successful in Contra Costa. She participated in visits and wanted an inpatient program, but she was not offered the services she needed.

D.H. also opposed termination of his reunification services, giving two reasons. First, D.H. participated in therapy. Second, Fairweather was out on medical leave "a significant amount of time over the past eight months." Counsel argued that the court and parties were all aware of this fact because they were involved in other cases with Fairweather.

17

County counsel urged the court to follow the Bureau recommendations to terminate services and schedule a section 366.26 hearing. The Bureau acknowledged that mother completed a parenting class and visited T.R., but argues that her visits were not consistent. More to the point, mother continued to abuse substances throughout the reunification period, never engaging in the services offered to her to address this problem. For his part, D.H. had "some individual counseling," and he accompanied mother to visits, but he failed to demonstrate that he is "committed to a life of sobriety" or to being a parent to T.R. County counsel urged the court to focus on the statutory timelines governing this case. T.R. was under the age of three when he was removed from mother in April 2020, which meant that October 28, 2021 was the 18-month statutory deadline for completing reunification. The parents had failed to engage in services or make any meaningful changes and there was no substantial likelihood of reunification by the 18-month deadline.

T.R.'s counsel agreed that the court should focus on the October 2021 deadline. However, despite her initial concurrence in the Bureau recommendations, T.R.'s counsel was concerned about the impact of the social worker's medical absences. Counsel opined that "if the Court determines that reasonable services in the last reporting period were not provided, then certainly more services can legally be provided."

### 3. Juvenile Court Rulings

As a preliminary matter, the juvenile court stated that it would base its rulings on evidence in the record; it would not consider extraneous information that the court and parties may have heard about the social worker's medical leave issues. Based on its review of the record, the court found that reasonable services were provided to both parents. In explaining

this ruling, the court credited Ms. Resendez's testimony and the Bureau reports. The court also found the following facts were established by the record: A social worker and supervisor had been assigned to T.R.'s case for the entire time following transfer from San Francisco; Fairweather had regular contact with mother when he managed the case; parents were offered "a large number of services"; and the social worker who was assigned after Fairweather took medical leave actively managed the case.

The court also addressed each parent separately and summarized evidence demonstrating that they failed to engage in services or make substantive progress toward reunification. Mother has a long history of serious mental health problems and substance abuse, but she failed to participate in therapy or drug testing. Nor had D.H. made an effort to engage in his case plan, the court found. He did not drug test or participate in drug treatment or a parenting class. He did participate in therapy for a few months but was unable to demonstrate that he received any insight or benefit from that treatment.

Ultimately, the juvenile court followed the Bureau's recommendations, finding, among other things, that returning T.R. to parental custody would be detrimental to his health and well-being; reasonable reunification services were provided; and mother and D.H. made minimal progress toward alleviating the problems that led to the dependency.

## DISCUSSION

Petitioners all seek review of the juvenile court's decision to schedule a section 366.26 hearing instead of extending the family reunification period. When a dependent child cannot be safely returned home at the 12-month review, the juvenile court has discretion to extend the reunification period to the 18-month deadline only if: (1) reasonable services have not been

provided; or (2) there is a substantial probability that the child can be returned to the physical custody of the parents and "safely maintained in the home within the extended period of time . . . ." (§ 366.21, subd. (g)(1).) In the present case, no parent contends that T.R. could have been safely returned to parental custody if the reunification period had been extended to the 18-month statutory deadline.

## I.  Mother's Petition

Mother contends that the juvenile court erred by failing to extend the reunification period because she was not provided with reasonable reunification services.  We review the challenged finding for substantial evidence.  (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689; *Patricia W. v. Superior Court* (2016) 244 Cal.App.4th 397, 419.)

" 'The adequacy of the reunification plan and of the department's efforts to provide suitable services is judged according to the circumstances of the particular case.' " (*In re K.C.* (2012) 212 Cal.App.4th 323, 329.)  Because the " 'focus of reunification services is to remedy those problems which led to the removal' " of a child, a reunification plan "must be tailored to the particular individual and family." (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598.)  "To support a finding reasonable services were offered or provided, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult . . . .' " (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1426, italics omitted.)

In the present case, T.R. was removed from mother due to mother's untreated mental health and substance abuse issues and her failure to

20

reunify with four older children. The record contains substantial evidence that the Bureau provided mother with reasonable services designed to address these problems by offering her drug testing, substance abuse treatment, individual therapy, and parenting education.

Mother contends these services were not reasonable because they did not focus on her mental illness, which should have been the starting point of her case plan. This argument ignores evidence that mother's mental health problems are inextricably intertwined with her long history of substance abuse. The record shows that mother refused to participate in individual therapy, stopped participating in her outpatient substance abuse program after the provider reported that she was not utilizing this service adequately, and consistently refused to participate in drug testing. In light of this evidence, mother's attempt to blame the Bureau for failing to gather better information about the nature of mother's mental illness is not persuasive. Although the social services agency is required to assist parents with their case plans, it cannot force them to participate in services that are offered to them. (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1233.) " 'Reunification services are voluntary . . . and an unwilling or indifferent parent cannot be forced to comply with them.' " (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1365.)

Mother also contends that the Bureau did not actually assist her in engaging in services that were ostensibly provided. As a preliminary matter, we reject mother's claim that the Bureau's social worker "appeared to be barely motivated to assist mother." This assertion, which is not supported by any citation or factual example, is inconsistent with the Bureau's reports and with Ms. Resendez's testimony, all of which were credited by the trial court.

Furthermore, " '[t]he standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' " (*Katie V. v. Superior Court, supra*, 130 Cal.App.4th at pp. 598–599.) "In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) Here, the record shows that two social services agencies made reasonable efforts to facilitate family reunification. After the case was transferred to Contra Costa, the case worker had multiple discussions with mother about her case plan obligations, provided written and oral instructions and referrals to services, and hand delivered bus tickets to ensure that mother could attend the services that were offered to her. We conclude that these efforts were reasonable under the circumstances.

## II. D.H.'s Petition

D.H. contends there is insufficient evidence that reasonable services were provided to him in Contra Costa. We disagree.

In addition to mother's untreated mental health and substance abuse issues, the other major problem that led to this dependency was D.H.'s refusal to be assessed by the social services agencies as a potential caretaker for T.R. D.H. appeared late in the proceeding and then only as a potential co-parent with mother. Moreover, when D.H. finally presented himself to the San Francisco case worker, it appeared that he was actively abusing substances.

Thus, the case plan for D.H. in San Francisco and in Contra Costa focused on addressing substance abuse issues as an essential first step toward reunification. Yet, D.H. never drug tested and failed to follow up on referrals to be evaluated for substance abuse. Without this basic evaluation,

22

both agencies were hamstrung in terms of their ability to assess whether D.H. could be an adequate parent for T.R. Nevertheless, the Contra Costa agency also offered D.H. parenting education and counseling, which were additional means of attempting to assess whether D.H. could be a safe parent for T.R. Finally, although the juvenile court in San Francisco denied D.H. any visitation, he was offered supervised visits in Contra Costa. We conclude these services were tailored to facilitate D.H's reunification with T.R. and were reasonable under the circumstance presented here.

D.H. contends the finding that he was provided reasonable services cannot be sustained because there is no evidence that he was offered visitation for the entire reunification period. When this case was transferred, there were ongoing concerns about D.H.'s potential exposure to COVID that continued until at least October 2000. After those concerns were resolved, these parents were not restrained by a formal visitation schedule. The parents visited T.R. together, and the visits were arranged to accommodate mother, whose visitation plan was more liberal than D.H.'s plan. We do not find any indication in this record that D.H. was ever denied the opportunity to visit T.R. or that he ever expressed a concern about his visitation. Nor did D.H.'s counsel even mention visitation at the status review hearing. Under these circumstances, we reject D.H.'s after-the-fact suggestion that his visitation plan may have been an impediment to reunification. (See *In re Christina L.* (1992) 3 Cal.App.4th 404, 416 [if during the reunification period, parent felt her services were inadequate, "she had the assistance of counsel to seek guidance from the juvenile court in formulating a better plan"].)

D.H. also complains that the Bureau did not do enough to assist him, claiming that he had no assistance for significant periods due to the social worker's medical leave problems. D.H. does not cite the record or provide a

factual example to support his claim that the Bureau's personnel issue adversely impacted the quality of his services. Instead, he bases this claim on Resendez's alleged admission that the Bureau had concerns about how Fairweather handled T.R.'s case. D.H. misreads the record. Resendez testified that the Bureau had unspecified concerns about how this social worker was handling his cases generally. She did not testify that there were any concerns about the quality of the reunification services provided to this family.

D.H. insists that the services provided to him were not reasonable because he was not adequately supported in his reunification efforts. (Citing *In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) The record shows that caseworkers had multiple regular contacts with D.H., and that reasonable efforts were made to ensure that D.H. understood his plan objectives and obligations, and to ensure that D.H. had the information he needed to begin to participate in services. This evidence supports the conclusion that the impediment to family reunification was not inadequate support from caseworkers, but D.H.'s lack of commitment to achieving his plan objectives by participating in services.

By separate argument, D.H. contends the juvenile court committed reversible error by continuing with the review hearing despite the fact that the Bureau reports contained incomplete information. Specifically, D.H. contends that the Bureau failed to provide sufficient information about D.H.'s participation in individual therapy and compliance with his visitation plan. In presenting this argument, D.H. assumes that there is information about his participation in these services that is missing from the record and that would change a material finding that the juvenile court made. We find nothing in the record to warrant such speculation. Moreover, in conducting

our substantial evidence review, the issue is not whether the Bureau could have provided more information about D.H., but whether the information that was provided supports the court's findings. Here, there is no dispute that D.H. was provided individual therapy. As discussed above, he was also afforded the opportunity to visit with T.R. These services along with drug testing, a substance abuse assessment and a parenting class constituted reasonable reunification services.

D.H. intimates that additional information about his progress in therapy and his visits with T.R. could have made a difference because if there was substantial progress in these areas the court could have extended the reunification period. This argument is not only speculative but demonstrably unsound. The juvenile court was aware that D.H. participated in therapy for a few months, but it was not convinced that D.H. had gained benefit or insight from therapy sufficient to assist him in achieving his case plan objectives. Evidence supporting this finding includes the fact that D.H. was unable to articulate any benefit of therapy when questioned by the social worker. Regarding visitation, the updated case plan explicitly acknowledges that D.H. participated in several visits, listing the dates of those visits. That D.H.'s visits with T.R. were unremarkable by anyone, including D.H. himself, and that the visits never progressed beyond occasional and supervised, supports the social worker's view that D.H. was not committed to reunifying with T.R. We note further that D.H. did not personally attend the contested review hearing.

In claiming that the Bureau should have provided more evidence about D.H.'s case plan progress, D.H. ignores what this record actually shows. D.H refused to drug test or to be assessed for substance abuse problems. Evidence that D.H. failed to participate in these court-ordered services is undisputed,

as is the fact that D.H. made *no* progress toward plan objectives to stay free from illegal drugs, to live free from drug dependency, and to comply with court orders to drug test. There is also substantial evidence that D.H. flouted the Bureau's efforts to facilitate reunification by abusing substances in mother's home, smoking marijuana in front of the social worker, and posting online evidence of what appeared to be his illegal drug use. Because D.H. consistently refused to make any effort to satisfy the core requirements of this family's case plan, his participation in therapy and supervised visits would not have warranted extending the reunification period.

## III. T.J.'s Petition

T.J. contends that the juvenile court erred by setting a section 366.26 hearing without first determining whether T.J. is T.R.'s biological father. This contention is not supported by T.J.'s bare-bones writ petition. Specifically, T.J. fails to articulate why a determination of biological parentage is relevant to any finding that the juvenile court made in support of its decision to refer this case for a section 366.26 hearing. Nor does T.J. cite any legal authority requiring the juvenile court to order DNA testing under the circumstances presented here.

When this dependency case was filed, T.J. and D.H. were both identified as alleged fathers of T.R. D.H. requested a paternity determination and was elevated to presumed father status. T.J. did not oppose D.H.'s request, made no competing request of his own, and instead had his appearance as an alleged father stricken from the record. After the case was transferred to Contra Costa and the Bureau recommended setting a section 366.26 hearing, T.J. attempted to re-enter the proceeding, but even at that end stage of this dependency case, T.J. did not attempt to change his status as an alleged father.

26

"California law distinguishes ' "alleged," ' ' "biological," ' and ' "presumed" ' fathers. [Citation.] ' "A man who may be the father of a child, but whose biological paternity has not been established, or, in the alternative, has not achieved presumed father status, is an 'alleged' father." ' [Citation.] ' "A biological or natural father is one whose biological paternity has been established, but who has not achieved presumed father status." ' [Citation.] 'Presumed father status ranks highest' [citation], and '[o]nly presumed fathers are entitled to reunification services and to possible custody of the child.' " (*In re Hunter W.* (2011) 200 Cal.App.4th 1454, 1461.)

As an alleged father, T.J. does not have a right to reunification services or custody. (*In re Kobe A.* (2007) 146 Cal.App.4th 1113, 1120; *In re O.S.* (2002) 102 Cal.App.4th 1402, 1410 (O.S.).) Nor does he have a cognizable interest in the issues the juvenile court considered when deciding whether to set the matter for a section 366.26 hearing, such as whether mother or D.H. received reasonable family reunification services. (*O.S*, at p. 1406; see *Clifford S. v. Superior Court* (1995) 38 Cal.App.4th 747, 751–753 [alleged father lacks standing to challenge termination of family reunification services by extraordinary writ].)

Importantly, even if T.J. were to establish biological paternity, that fact would not elevate him to presumed father status. "A man's status as biological father based on genetic testing does not entitle him to the rights or status of a presumed father. [Citation.] In determining presumed father status under section 7611, ' "it is irrelevant that the biological father can prove his paternity or even that all parties to the proceedings may concede that [he] is the biological father." ' [Citation.] Indeed, courts consistently recognize 'the extant father-child relationship is to be preserved at the cost of biological ties.' " (*In re P.A.* (2011) 198 Cal.App.4th 974, 980.)

27

As an alleged father, T.J. does have the right to notice and an opportunity to show he should be afforded presumed father status. (*In re J.O.* (2009) 178 Cal.App.4th 139, 147; *O.S.*, *supra*, 102 Cal.App.4th at p. 1408.) The record before us contains substantial evidence that T.J. did have notice of T.R.'s dependency case and yet he never attempted to become T.R.'s presumed father, never requested reunification services, and never sought actively to participate in this proceeding until, more than a year after asking the court, through counsel, to strike his status as an alleged father, he reappeared and began asking for a DNA test.[1]

T.J. contends that the juvenile court violated its "duty" by failing to determine the identity of T.R.'s biological father before setting a section 366.26 hearing. This argument is unsupported by analysis or relevant authority. Instead, T.J. cites one inapposite case, *In Re J.H.* (2011) 198 Cal.App.4th 635 (*J.H.*).

---

[1] T.J.'s petition contains a brief factual summary, which states that T.J. had no knowledge of this dependency case until it was transferred to Contra Costa County, but this assertion is not supported by a citation to the record or a declaration. Nor is T.J.'s petition verified by anyone. We find substantial evidence that T.J. was afforded notice and the opportunity to establish presumed father status. The record shows that, prior to the jurisdiction hearing, the Agency obtained an address and phone number for T.J. at the San Bruno county jail, and that the San Francisco Superior Court sent T.J. notices of proceedings there. When T.J.'s current counsel first appeared on his behalf in the Contra Costa court on January 28, 2021, she did not claim that T.J. had had no notice of the dependency case, but stated T.J. was "not exactly sure what the proceedings were in San Francisco before this case was transferred to Contra Costa . . ."

We also note T.J. does not dispute he knew about T.R.'s birth and knew he was potentially the child's father. Despite this knowledge, there is no evidence T.J. ever took any step to provide for T.R. or to develop a personal relationship with him.

28

*J.H.* involved two alleged fathers, Tyrone and George, who appeared before the juvenile court after the minor was removed from his mother. (*J.H.*, *supra*, 198 Cal.App.4th at p. 638.) Both men filed declarations of parentage and requested to be declared presumed fathers. (*Id.* at pp. 638 & 641.) Tyrone also asked the court to order a DNA test so that he could assert his biological paternity. (*Id.* at p. 641.) Following a hearing, the juvenile court found that George was J.H.'s presumed father while Tyrone was an alleged biological father. (*Id.* at p. 643.) These findings were affirmed on appeal, but the parentage order was reversed in part and remanded because the juvenile court never ruled on Tyrone's request to establish biological paternity through DNA testing. A ruling on that issue was required by California Rules of Court, rule 5.635(h), which states that when a person appears at a hearing in a dependency matter and "requests a judgment of parentage on form JV-505," the juvenile court must determine "[w]hether that person is the biological parent of the child." In remanding the case for this additional finding, the *J.H.* court acknowledged that the juvenile court may refuse to grant a paternity test when the results would be irrelevant. (*J.H.*, at p. 648, citing *In re Joshua R.* (2002) 104 Cal.App.4th 1020.) But the appellate court found that Tyrone's biological paternity could have been relevant in the ongoing dependency proceeding. (*Id.* at p. 650.)

In contrast to *J.H.*, the challenged order in this proceeding is not a parentage order. D.H. was elevated to presumed father status without any attempt by T.J. to appeal. Furthermore, we find no indication that T.J. has ever requested a judgment of parentage in this dependency case. Thus, California Rules of Court, rule 5.635(h) has no application here. T.J. does not cite any law requiring the juvenile court to order a DNA test before scheduling a section 366.26 hearing.

29

T.J. also contends that the juvenile court may have violated his right to equal protection by denying his section 388 petition for DNA testing. The orders denying T.J.'s section 388 petitions are not before us in this writ proceeding. They were made several weeks before the status review hearing and they were directly appealable. (*In re K.C.* (2011) 52 Cal.4th 231, 235–236.) Indeed, T.J. has filed an appeal from the denial of his section 388 petitions, which is currently pending in this court. (See *Contra Costa Children and Family Services Bureau v. T.J.* (A163394, app. pending).)

Thus, we construe T.J.'s assertion as an argument that his constitutional right to equal protection precludes the court from setting a section 366.26 hearing without first determining if T.J. is T.R.'s biological parent. We reject this suggestion, which is unsupported by facts or law. T.J. relies on *In re Mary G.* (2007) 151 Cal.App.4th 184, which has no relevance here. In that case, an alleged father was denied presumed father status and reunification services solely because his declaration of paternity was signed and submitted in Michigan rather than California. In reversing a judgment terminating parental rights, the *Mary G.* court found that the alleged father's constitutional right to equal protection was violated because his disparate treatment was "based solely on geography, and location of a father inside or outside the state bears no more relation to the purposes of the presumed father statute than differing locations of fathers within California." (*Id.* at p. 200.) In contrast to *Mary G.*, T.J. did not file a declaration of paternity in any state, request presumed father status, or request reunification services. Nor did he oppose or appeal the parentage order establishing that D.H. is the presumed father of T.R.

## DISPOSITION

The petitions for extraordinary relief are denied on the merits.  Our decision is final as to this court immediately.  (Cal. Rules of Court, rule 8.490(b)(2)(A).)


TUCHER, P.J.


WE CONCUR:

FUJISAKI, J.
RODRIGUEZ, J.

*Terri R. et al. v. Superior Court* (A163402)